# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 27, 2001 Session

## STATE OF TENNESSEE v. DARYL KEITH HOLTON

**Direct Appeal from the Circuit Court for Bedford County**
**No. 14302     William Charles Lee, Judge**

---

**No. M2000-00766-CCA-R3-DD - Filed July 17, 2002**

---

The appellant, Daryl Keith Holton, was convicted by a jury in the Bedford County Circuit Court of four counts of first degree premeditated murder. The same jury imposed a sentence of death for each count of murder. The appellant now appeals both his convictions and sentences, presenting the following issues for our review: (1) whether the evidence adduced at trial is sufficient to support the jury's verdicts; (2) whether the statute setting forth the defense of insanity in Tennessee is violative of the United States Constitution in the context of a prosecution for first degree premeditated murder; (3) whether under the United States Constitution inadequate acoustics in the courtroom during his trial denied the appellant his right to a fair trial; (4) whether under the United States and Tennessee Constitutions the imposition of a sentence of death violates a criminal defendant's fundamental right to life; (5) whether the evidence adduced during the guilt/innocence and sentencing phases of the appellant's trial supports the jury's imposition of sentences of death; and (6) whether the appellant's sentences of death are comparatively disproportionate. Following a thorough review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

John E. Appman, Jamestown, Tennessee (at trial and on appeal), and Donna Hargrove, A. Jackson Dearing, III, and Larry F. Wallace, Jr., Fayetteville, Tennessee (at trial), for the appellant, Daryl Keith Holton.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; W. Michael McCown, District Attorney General; and Weakley E. Barnard, Robert G. Crigler, and Ann L. Filer, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

On April 20, 1998, a Bedford County Grand Jury returned a four-count indictment charging the appellant, Daryl Keith Holton, with the first degree premeditated murder of his four children on November 30, 1997.  Specifically, the indictment arose from the appellant's confession to the fatal shootings of twelve-year-old Stephen Edward Holton, ten-year-old Brent Holton, six-year-old Eric Holton, and four-year-old Kayla Marie Holton.[1]  The State filed a notice of its intent to seek the death penalty on April 20, 1998, which notice it supplemented on May 7, 1999. Ultimately, the State relied upon the appellant's commission of mass murder, Tenn. Code Ann. § 39-13-204(i)(12) (1997), in seeking the death penalty for all four counts of the indictment and additionally relied upon the age of the victims and the age of the appellant, id. at (i)(1), in seeking the death penalty for Counts Two, Three, and Four.

Soon after the State filed its notice of intent to seek the death penalty, on June 22, 1998, the trial court ordered that Dr. William D. Kenner, a psychiatrist, evaluate the appellant to determine his competency to stand trial for the murder of his children.  Pursuant to the court's order, Dr. Kenner examined the appellant and concluded that the appellant was in fact competent.  Indeed, following the appellant's trial, the trial court noted that the appellant had been evaluated by "no less than five mental health professionals [during the course of the capital proceedings] . . . .  At no time [was] the Defendant . . . found incompetent."  Having been found competent to stand trial, the appellant filed a notice on October 14, 1998, of his intent to rely upon the insanity defense at trial and introduce expert testimony in support thereof.  A jury was impaneled and sworn and the guilt/innocence phase of the trial commenced on June 8, 1999.

### Guilt/Innocence Phase

The State presented a thorough and straightforward case during the guilt/innocence phase of these capital proceedings.  Crystal Holton, the appellant's ex-wife, opened testimony on behalf of the State, recounting the history of her relationship with the appellant culminating in his murder of their children.  According to Ms. Holton, she first met the appellant in 1984 when he was in the United States Army and stationed at Fort Jackson in South Carolina.  Ms. Holton and the appellant married in August 1984, and shortly thereafter the Army reassigned the appellant to a post in Germany where he administered a dental clinic.  While the appellant was stationed in Germany, Ms. Holton gave birth to two sons, Stephen and Brent, on August 23, 1985, and May 21, 1987, respectively.  Ms. Holton noted that, during this time period, the appellant "was happy and doing a good job."  Indeed, she remarked that the appellant "loved" his military career.  As to their marriage, Ms. Holton characterized her relationship with the appellant as "[u]p and down."

Following the appellant's tour of duty in Germany, the Army reassigned the appellant to Fort Gordon in Georgia.  Moreover, following the conclusion of the Gulf War, the appellant volunteered for service in Saudi Arabia.  During the appellant's tour of duty in the Middle East, Ms. Holton remained in the United States with Stephen and Brent and gave birth to a third child, Eric,

---

[1]As indicated subsequently in this opinion, Kayla Marie Holton was not the natural child of the appellant.

on September 27, 1991. Ms. Holton noted at trial that her third child suffered a hearing impairment requiring hearing aids for both ears.

Around the time of Eric's birth, the federal government began to route the appellant's paychecks incorrectly, and Ms. Holton began to encounter serious financial difficulties. Moreover, Ms. Holton admitted to the jury that, one evening soon after Eric's birth, she went to a country music dance hall and left the children home alone. She stayed at the dance hall all night and, when she returned home in the morning, was greeted by the police and representatives from the Georgia Department of Human Services. The police declined to press criminal charges against Ms. Holton, and the Department of Human Services permitted her to retain custody of her children. Nevertheless, Ms. Holton placed her children in the care of the appellant's father in Shelbyville, Tennessee, and began to reside with a friend in Georgia.

Upon learning of these developments, the appellant secured an emergency leave of absence and returned to the United States for several days. However, he was unable to resolve his marital difficulties. Accordingly, when he returned to Saudi Arabia to complete his tour of duty, his children remained in the care of his father; meanwhile, Ms. Holton visited a cousin in Indiana and, at some point, moved to South Carolina.

The appellant finally returned to Fort Gordon in Georgia in early 1992 and, due to his wife's desertion, obtained a divorce and acquired custody of the children. Moreover, in order to facilitate his care of his three sons, he obtained an honorable discharge from the Army and moved with them to Tennessee. Ms. Holton recalled that the appellant brought the children to visit her in South Carolina two or three times each month.

On June 22, 1993, Ms. Holton gave birth to a fourth, biracial child named Kayla Marie as a result of a "one night stand" with a man named "Chuck." According to Ms. Holton, the appellant responded to the advent of this child "rather well." In fact, the appellant suggested that Kayla bear his last name. Moreover, during Ms. Holton's pregnancy, she and the appellant began residing together once again in an apartment in Shelbyville, Tennessee. Although the appellant and Ms. Holton did not remarry, they lived together with the children for approximately one and one-half or two years. Ms. Holton admitted to the jury that she drank heavily during this period. Moreover, the appellant hit his ex-wife on numerous occasions, blaming his violence on Ms. Holton's drinking habit.

Ms. Holton eventually moved out of the apartment that she shared with the appellant, taking the children with her and seeking assistance from a battered women's shelter. After a brief stay in the shelter, Ms. Holton and the children moved into a public housing project in Murfreesboro, Tennessee. The appellant ultimately learned of their location and began visiting the children every day; at some point, a court awarded the appellant visitation with his children on weekends. Ms. Holton noted that, at this time, the appellant expressed to her concern about the crime rate in the neighborhood in which she and the children lived. Also, her housekeeping was mediocre, and the appellant frequently complained about the condition of her apartment. Finally, Ms. Holton admitted

that she regularly accepted money from the appellant for the purchase of alcohol and, in fact, purchased several pint-sized bottles of liquor every week. She denied, however, demanding money or liquor as a condition of the appellant's visitation with the children. On the contrary, Ms. Holton noted that the appellant's visitation with the children proceeded smoothly until one Sunday night in 1995.

The 1995 incident began when the appellant drove the children home following a weekend visit but refused to allow them to get out of his car. Instead, the appellant informed his ex-wife that she would have to join the children in the car in order to see them. Although she did not see any weapon, Ms. Holton received the impression from the appellant that he was armed. Accordingly, she refused to get into the car, whereupon the appellant stated that she was "going to regret it" and drove away with the children. Ms. Holton immediately called the police. On this occasion, however, the appellant learned of his wife's report to the police from a "police scanner" that he carried in his car, and he surrendered the children to the police unharmed. Ms. Holton recalled that the appellant continued to threaten that she would "regret it" if she ever took his children away from him.

Ms. Holton acknowledged at the appellant's trial that, during her residence in Murfreesboro, the Tennessee Department of Human Services briefly obtained legal custody of the children, albeit Ms. Holton retained physical custody. Thereafter, on February 27, 1996, Ms. Holton and the appellant agreed to the entry of an order by the Bedford County Juvenile Court granting Ms. Holton legal and physical custody of all four children. Indeed, the appellant informed the court that "it would be in the best interest of the minor children that full custody be granted to the natural mother with visitation to be at the discretion of the mother." The appellant continued visiting the children until the late summer or early fall of 1997, at which time Ms. Holton obtained an order of protection against the appellant and moved with the children to a different address. According to Ms. Holton, the appellant was unaware of the new address and did not see the children again until November 30, 1997, the day on which he murdered them.

In September 1997, Ms. Holton met a man named Morris Rhodes through a friend and neighbor with whom Rhodes had a five- or six-year-old daughter named Franchesca or, more familiarly, "Kiki." Ms. Holton and Rhodes initiated an intimate relationship and, in October 1997, began residing together along with Ms. Holton's children and, periodically, Kiki. At that time, Ms. Holton believed that the appellant was unaware of her relationship with Rhodes.

Notwithstanding the order of protection and in response to the children's requests to see their father, Ms. Holton attempted to contact the appellant on November 27, 1997, Thanksgiving Day. Specifically, she called a garage in Shelbyville where the appellant was both working for his uncle repairing cars and currently residing, but no one answered the telephone. However, the appellant returned his ex-wife's telephone call the following day, inquiring why she had attempted to contact him. When Ms. Holton explained that the children "missed him and . . . wanted him to take them Christmas shopping," the appellant responded that "he didn't think anybody remembered he was still their dad." At some point, he also referred to Ms. Holton's current boyfriend and

expressed concern that the children might be calling her boyfriend "Dad." Ms. Holton reassured the appellant and made arrangements for him to visit the children on Sunday, November 30, 1997. According to Ms. Holton, she was to leave the children with the appellant on Sunday at 3:00 p.m. in a Wal-Mart in Murfreesboro. The appellant was to return the children at 9:30 p.m. to the Rutherford County Sheriff's Department. Ms. Holton selected the latter location because her boyfriend was to collect Kiki from the child's mother at the sheriff's department on the same night.

The appellant telephoned Ms. Holton once again on Saturday, November 29, and inquired whether he should purchase the children clothing during the Sunday visit. Additionally, he requested permission to take the children to a movie theater in Shelbyville and remarked that he wanted the children to see a dog that he kept in the garage where he lived and worked.

On Sunday, the children appeared to be excited about the scheduled visit with their father. Brent drew his father a picture inscribed with the words, "From Brent and Kayla. I love you Daddy." Also, when the Holtons met at the Wal-Mart at 3:00 p.m., the children ran to the appellant and hugged him. The appellant returned his children's embraces. However, Ms. Holton recalled that the appellant appeared detached or "numb." After leaving her children in the appellant's care, Ms. Holton never saw them alive again.

At approximately 9:44 p.m. on November 30, 1997, the appellant walked into the lobby of the Shelbyville Police Department and informed the dispatcher, Bonnie Hill, that he wished to report a "homicide times four." Hill testified at the appellant's trial that the appellant appeared to be calm and, indeed, displayed no emotion. Hill asked the appellant to wait in the lobby and, because there were no officers present at the police station, radioed for assistance. Sergeant Nicholas Worthington arrived at the station soon thereafter.

Sergeant Worthington of the Shelbyville Police Department testified at trial that he was driving into the parking lot of the police station when he overheard Hill on the radio requesting assistance. Accordingly, Worthington went inside the station and briefly spoke with Hill before approaching the appellant. In response to Worthington's questioning, the appellant stated his name, address, and birth date and again indicated that he wished to report four homicides. When Worthington further inquired how the appellant had learned of the homicides, the appellant responded that he had killed his four children. The appellant then spontaneously stood and placed his hands behind his back in order to allow Worthington to handcuff him.

Upon handcuffing the appellant, Worthington ceased any questioning. Nevertheless, the appellant continued to talk, explaining to Worthington that he had murdered his children because his wife and the Department of Human Services had withheld them for several months without permitting the appellant visitation. The appellant also informed Worthington that he had killed the children in his uncle's automobile repair garage with an SKS semi-automatic rifle and indicated that both the murder weapon and the bodies were still inside the garage.

Worthington recalled at trial that, during his encounter with the appellant, the appellant spoke in a matter-of-fact tone and appeared very calm, never exhibiting any "extraordinary or b[i]za[rre]" behavior. Officer Rodney Stacey, who had known the appellant for approximately four or five years prior to these offenses, arrived at the station shortly after Worthington and similarly testified at trial that the appellant appeared very calm and normal.

Worthington and Stacey left the appellant at the police station in the care of another officer and drove to "Holton's Wrecker Service and Garage." As Worthington and Stacey left the police station, the appellant warned them that there was a homemade explosive device inside the garage. At the garage, the officers in fact discovered homemade incendiary devices in addition to the murder weapon and the children's bodies. The children's bodies were stacked underneath a tarpaulin in a rear bay of the garage.

Detective Pat Mathis of the Shelbyville Police Department testified at the appellant's trial that at approximately 11:00 p.m. on November 30, 1997, he received a call from Lieutenant Chris Szaroleta notifying him of a homicide at Holton's Wrecker Service and Garage. Accordingly, Mathis drove to that location and examined the crime scene. After examining the scene, he drove to the police station with Szaroleta and Detective Tony Collins for the purpose of interviewing the appellant. At the station, Mathis noted that "there was bloodstains and tissue matter on [the appellant's] clothing." Subsequent testing revealed that blood on the appellant's clothing contained DNA profiles matching those of the appellant's children.

As to the officers' interview of the appellant, Collins first advised the appellant of his Miranda rights, and the appellant signed a written waiver of those rights. Mathis recalled that, during the interview, the appellant was calm and cooperative. He denied having drunk alcohol that day, although he stated that he had unsuccessfully "tried to smoke a joint" following the murders. The appellant also denied that he was in any way intoxicated. Mathis observed that the appellant appeared to have no difficulty recalling past events and appeared to answer the officers' questions truthfully, thinking carefully about each response. Indeed, the appellant provided details about the murders that were consistent with Mathis' observations at the crime scene. Moreover, the appellant provided a second statement on December 3, 1997, that was likewise consistent with the results of the police investigation of the murders.

The appellant related to the police that he had first considered murdering his children approximately two years before these offenses. On that occasion, he was driving the children home to their mother following a weekend visit and was armed with a "Derringer." The appellant recalled, however, that he "couldn't do it" and instead contacted the police. The appellant did not communicate to the police at that time that he was contemplating murdering his children. Nevertheless, the officers removed the children from his care, confiscated his weapon, and advised him to seek counseling. The appellant did not follow the officers' advice.

The appellant further related that approximately two months prior to these offenses, in September, his ex-wife had obtained an order of protection against him due to a "domestic assault." The appellant recalled:

> [A] police officer came and told me that I would not be able to see my children, and I had to come to court. I did not come to court.
>
> I kept driving by [my ex-wife's apartment] and wanting something to happen. I wanted her to call. I would go up to Murfreesboro and drive by the apartment. It never happened, and then all of a sudden everything was gone. There were no lights, no clothes on the line, or nothing. They were gone.

According to the appellant, his ex-wife finally called on Friday, November 28, in order to make arrangements for the appellant's visitation with his four children. The appellant decided at that time that he was going to murder the children. He explained that "[t]he kids had been taken away from me and given back to me, taken away from me and given back to me enough." The appellant elaborated:

> If you take - - you take somebody's kids away, you've made a terrible mistake. And there is the tendency of social agencies, churches, courts, there's the tendency to take the children, place them with their mother, and forget the father. Not one time, not one time did anyone contact me until Thursday. They didn't get in touch with me Thursday, but they tried Thursday. They finally got in touch with me Friday, telling me how my kids were and where they were, to offer me anything.
>
> And I spent ten and a half years in the Army. I spent a lot of time away from my children. That's what it was all about. I busted my ass. I did a good job, not just for me, for my children, for my family, that house in the country, that dream. I can speak for myself. I don't . . . have that taken away too easily and just get over it. I didn't get over it.

On Friday, November 28, the appellant made arrangements with his ex-wife to see his children on Sunday and during the intervening time period formulated a specific plan according to which he would murder the children in his living quarters in the rear bay of his uncle's garage during the Sunday visit. In preparation for the murders, he hid a loaded SKS semi-automatic rifle behind a mattress in his living quarters. Moreover, he parked a car outside his uncle's garage for his use following the murders, pointing the vehicle in the direction he would need to travel. In particular, the appellant planned to drive to Murfreesboro after murdering his children and "to basically shoot" Kiki, the five- or six-year-old daughter of his ex-wife's current boyfriend, in addition to firebombing his ex-wife's new residence. For the purpose of firebombing his ex-wife's residence, he prepared five incendiary devices or "fire bombs." He also ascertained his ex-wife's new address using a telephone book, street maps, and the number that he had retrieved from the

caller identification device attached to the telephone at his uncle's garage. Furthermore, having discovered his ex-wife's address, the appellant drove by her residence on the day before the murders.

On Sunday, November 30, the appellant retrieved his children from his ex-wife at a Wal-Mart in Murfreesboro. He recalled that Ms. Holton "was dressed nicely. She was wearing makeup. She said she was happy. And that did not make me happy." He also related that his children "all came up and hugged me. Kayla just wouldn't let go of me. As many times that I hadn't seen them for a while, and she grabbed me and she wouldn't let me go." Notwithstanding his children's obvious joy at reuniting with their father, the appellant never reconsidered his plan to murder them.

The appellant took his children to a McDonald's restaurant to eat dinner and to an amusement park or arcade before driving them to his uncle's garage. He noted to police that he "had to play along to avoid any suspicion on the children's part." At the garage, the appellant showed the children several motors and permitted them to play with some of the tools. The appellant also recalled, "We just told each other we missed each other." Finally, at approximately 7:00 p.m. or 7:30 p.m., the appellant left Eric and Kayla playing in a front bay of the garage with an electric drill and a hammer and led Stephen and Brent to the rear bay where he had earlier hidden the SKS rifle.

In the rear bay, the appellant indicated to his older sons that he "had something for them." He then instructed them to close their eyes and stand in a line facing away from him, with Stephen in front and the shorter Brent behind. The appellant cautioned, "Don't peek," before removing the SKS rifle from its hiding place, kneeling behind the children, and aiming the rifle. The appellant explained that he positioned the children to enable him to pierce their hearts with a single shot. When he fired the first shot, the barrel of the rifle was angled upward and touching Brent's back. The appellant conceded that he "used multiple shots to ensure that [he] killed them both" and recalled that he covered their bodies with a tarpaulin to conceal them from their younger siblings.

The appellant next brought Eric and Kayla to the rear bay, again indicating that he "had something for them." The two children evidently had not heard any gunshots and inquired about their older brothers. In response, the appellant positioned them in a line as he had their brothers, "placed their hands over their eyes," and instructed them not to peek before kneeling behind them and firing the rifle into Kayla's back. Both children were struck by the first bullet, and the appellant recalled firing his weapon at least one more time into Kayla's chest. The appellant placed Kayla's and Eric's bodies with their older brothers' underneath the tarpaulin, "squared away the area," and washed his hands. The appellant noted to police that "[t]here was no enjoyment to [the murders] at all."

After murdering his children, the appellant prepared to execute the next phase of his plan, i.e., the murder of Kiki and the firebombing of his ex-wife's residence. The appellant reloaded the SKS rifle and placed the murder weapon and the five "fire bombs" inside the car that he previously had parked outside. He also "checked out the entrance of the shop to see if there was anything amiss, if anyone could have seen me." Moreover, he was listening to a "police scanner"

"to see if there had been any reports of gunshots or anything." He then began to drive toward Murfreesboro but soon decided that he did not have enough time to execute the remainder of his plan. Accordingly, he returned to his uncle's garage. The appellant noted that, at the garage, he had difficulty looking at his children's bodies. He considered committing suicide but ultimately resolved to surrender to the police.

In explaining his decision to curtail his original plan, the appellant noted, "I planned a lot of different scenarios and chose the one that time permitted. I was constantly subtracting - - going over what . . . options . . . - - were left." The appellant also observed, "I had done what I wanted to do. I wanted to shock [my ex-wife] to death. I was done. I was done." As to his decision to forego suicide, the appellant added that the murders were

the culmination of a lot of work . . . [and] people would come up with

their own conclusions if I had killed myself. . . . This is only part, one part of the story of what happened here. This is gruesome. This is awful. But it's only part of it. This has been going on for a long time. And if you're going to have a chance of understanding this, then you're going to have to talk to somebody that was involved. And I'm the only one that was involved that's still living. The appellant concluded that he loved his children but conceded that he would have difficulty convincing anyone of his love. He felt no remorse or regret for murdering his children.

The State also presented the testimony of Dr. Charles Warren Harlan, a consulting forensic pathologist and assistant medical examiner for Bedford County. Dr. Harlan testified that he performed autopsies on the appellant's four children, and he described the findings relating to each child in turn. First, Harlan related that ten-year-old Brent Holton died as a result of multiple gunshot wounds to the chest. Specifically, the doctor discovered two "contact gunshot wound entrances" in Brent's posterior chest or back and two corresponding exit wounds in Brent's anterior chest. Dr. Harlan opined that the contact entry gunshot wounds and the corresponding exit wounds were consistent with a scenario in which "a person . . . knelt down behind Brent Holton pointing the gun in an upward angle and pull[ed] the trigger." The doctor further noted that the wounds occurred in "very close time proximity." Finally, Dr. Harlan recounted that he also discovered one "re-entry gunshot wound" in Brent's anterior chest or "front right shoulder area." Dr. Harlan explained that a "re-entry gunshot wound" is caused by "a bullet which . . . passe[s] through an intermediate target" or "bounc[es] off of something" prior to striking a person's body. He posited that one of the bullets causing the contact entry gunshot wounds and the corresponding exit wounds may have ricocheted off the concrete floor of the garage and re-entered Brent's body. Dr. Harlan recovered the bullet from the child's body.

Dr. Harlan next testified that twelve-year-old Stephen Holton died as a result of multiple gunshot wounds to the chest and abdomen. Specifically, Dr. Harlan discovered one "re-entry gunshot wound" in Stephen's posterior chest or back. The doctor reiterated that a "re-entry gunshot wound" is one caused by a bullet that "has either gone through some intermediate target or been deflected." A corresponding exit wound was located in Stephen's anterior chest. The doctor confirmed that the wounds were consistent "with someone kneeling . . . holding a gun at an angle upward, shooting through Brent, that bullet passing through his body and entering Ste[ph]en's and

then still having enough force and velocity to pass through [Stephen's]." Dr. Harlan continued that the same bullet inflicted a "graze gunshot wound" to Stephen's chin and nose. The pathologist further noted a contact gunshot wound to Stephen's anterior chest and abdomen and a corresponding exit wound. Finally, he attested to entry and exit gunshot wounds to Stephen's right hand.

As to the four-year-old Kayla Holton, Dr. Harlan testified that she too died as a result of multiple gunshot wounds. Specifically, Kayla suffered a contact entry gunshot wound to the posterior chest or back and a corresponding exit wound. The doctor confirmed that the wounds were consistent with a scenario in which a person knelt behind Kayla, held a gun at an upward angle with the barrel touching her back, and pulled the trigger. Additionally, the doctor observed another entry gunshot wound to Kayla's anterior chest and a corresponding "partial exit" wound. He testified that these wounds were consistent with a scenario in which "[t]he child is standing up. Shooter is kneeling down . . . . Shoots her in the back. She falls down. Falls on her back. She is l[]ying front up . . . on concrete. Concrete floor. Then the shooter stands over her with a gun . . . and go[es] bang." The doctor retrieved "an extremely deformed bullet" and "smaller lead fragments" from Kayla's body.

Lastly, Dr. Harlan testified that the six-year-old Eric Holton died as a result of multiple gunshot wounds to his chest and abdomen. Specifically, the doctor recorded four entry gunshot wounds to Eric's posterior chest or back, at least one of which was possibly a "re-entry gunshot wound." Dr. Harlan noted that he was unable to determine whether the wounds were caused by three or four bullets. He explained that, if a bullet first passed through another person, the projectile might have split in two and inflicted two separate wounds to Eric's back. Eric also suffered two exit wounds to his anterior chest and abdomen, one of which was extremely large and likely resulted from more than one bullet. Finally, Eric suffered a gunshot wound to his right wrist. Dr. Harlan concluded that Eric's wounds were consistent with a scenario in which "[Eric] was standing in front of Kayla when she was shot. . . . [The shooter] was kneeling down . . . [when] he fired a shot through Kayla's back . . . . Eric had been told not to peek. . . . [H]e was told to close his eyes and place his hands over his eyes." Dr. Harlan recovered one bullet and several bullet fragments from Eric's body.

Teri Arney, an employee of the Firearms Identification Unit of the Tennessee Bureau of Investigation (hereinafter the TBI), identified at trial the SKS semi-automatic rifle and various spent bullets and cartridges recovered from the scene of the murders in this case. Moreover, Dan Royce, a firearms examiner with the TBI, noted that the rifle was functional and confirmed that spent bullets and cartridges recovered from the scene of the murders and spent bullets or bullet fragments recovered from the children's bodies were fired from the SKS rifle.

The appellant declined to testify in his own behalf. He did, however, present testimony in support of a defense of insanity and, alternatively, the proposition that he did not possess the capacity at the time of the murders to form the requisite mental state for first degree premeditated murder. In this regard, he first called Captain Daniel G. Brooks, the administrator of the Bedford County Jail, to the witness stand. Brooks testified that the appellant was placed on

"suicide watch" for approximately one week upon his admittance to the jail following his arrest for the murder of his children. Brooks noted, however, that the appellant was a quiet and cooperative prisoner.

The appellant also presented the testimony of his uncle, Gary Holton. Holton testified that he is an automotive technician and owns an automobile repair shop or garage in Shelbyville, Tennessee. At the time of the murders, the appellant had been employed in Holton's automobile repair garage for two or three years and had been residing in a rear bay of the garage for as few as four months. Holton recalled, "It was a bay that was 30 [feet] by approximately 24 [feet]. [The appellant] had plastic tarps draped [around] an area that he slept in that . . . was probably about a little more than a fourth of the size of [the] entire bay." Holton noted that the appellant used a propane heater to heat the area enclosed by tarpaulins, and the appellant's uncle recalled accompanying him on one or two occasions to purchase propane gas. Holton tentatively remembered that the temperature outside was between forty and fifty degrees Fahrenheit on the day of the murders.

Holton confirmed that, following the murders, the police returned to the scene of the crimes with a person or persons named Mosley,[2] who reconstructed the appellant's living quarters and tested the propane heater inside the enclosed area. Holton conceded that Mosley reconstructed the appellant's living quarters "better and tighter than it originally was." He also noted that the outside temperature was very cold at the time of the reconstruction of the appellant's living quarters and the testing of the heater.

Finally, Holton recounted to the jury that, prior to the murders, he saw his nephew daily. According to Holton, "After [the appellant] didn't get to see his kids, seemed liked he withdrew further and further. He became quieter and withdrawn, unresponsive. Totally unlike him." Also, the appellant's energy level seemed to decline. On the day of the murders, however, the appellant's mood changed "drastically." Holton asserted that the appellant appeared to be "very happy to get to see his children."

Dr. Leighton Sissom, a mechanical engineer, also testified on behalf of the appellant. Dr. Sissom related to the jury that he examined the rear bay of Holton's garage in which the appellant had resided prior to and at the time of the murders and obtained information from Holton concerning the appellant's living quarters. In particular, he obtained information from Holton concerning the arrangement of the plastic tarpaulins enclosing the appellant's living quarters. He did not, however, attempt to reconstruct the living quarters. Finally, Dr. Sissom examined the propane heater used by the appellant to heat his living quarters.

On the basis of his investigation, Dr. Sissom concluded that the ventilation of the appellant's living quarters was inadequate for use of the propane heater according to standards set forth both in the National Fuel Gas Code and in the operating instructions provided by the

---

[2]This name is spelled "Mosely" elsewhere in the record.

manufacturer of the heater. He noted the probability that carbon monoxide or nitrogen dioxide emissions from the heater accumulated in the appellant's living quarters. However, he was unable to testify with any certainty that the appellant was exposed to carbon monoxide on or before November 30, 1997, or state the degree of the appellant's probable exposure. Moreover, he conceded that testing of the heater did not reveal significant emissions of carbon monoxide. On the contrary, the heater was functioning properly.

Dr. Donna Seger, a toxicologist, testified on behalf of the appellant concerning the effects of carbon monoxide upon the human body. She related to the jury that carbon monoxide poisoning can affect a person's central nervous system, brain, and heart. She particularly noted that carbon monoxide poisoning can "have marked effects on memory, concentration; [can cause] decrease in IQ, marked inability to think in the way one had thought before; as well as depression, psychosis, neurologic deficit." She remarked, however, that the effects of carbon monoxide poisoning will vary depending upon "the length of time of exposure; the concentration during that time of exposure; the peak concentration reached during that time; the physical activity of the person; metabolic state of the person; and pre-existing medical disease." She conceded that she had not examined the appellant, nor was she familiar with the appellant's case.

The appellant further introduced a transcript of the deposition of Dr. Howard S. Kirshner, a neurologist. Dr. Kirshner testified that he interviewed the appellant and performed a neurological examination of the appellant on December 1, 1998, approximately one year following the appellant's offenses. He also reviewed a report of a forensic neuropsychological evaluation performed by Dr. Pamela Auble. He explained that he was primarily searching for symptoms or indications of carbon monoxide poisoning.

Dr. Kirshner conceded to the jury that he had treated very few patients in the past for carbon monoxide poisoning. Notwithstanding his limited experience, he related generally that severe carbon monoxide poisoning can cause seizures, paralysis, coma, and ultimately death. Less severe poisoning can result in acute symptoms including sleepiness, headaches, "associated trouble with thinking," "coordination problems," and a pink coloration of the skin; chronic symptoms include "memory loss or trouble with attention and concentration," "coordination difficulty," and "tremor and rigidity and stiffness." Additionally, poisoning might cause irritability "after there's been some recovery some weeks or months after the initial exposure." Finally, magnetic resonance imaging (hereinafter M.R.I.) of the brain will sometimes reveal the impact of carbon monoxide poisoning upon the brain as "small spots" or "multiple small holes like Swiss cheese."

During his interview with Dr. Kirshner, the appellant reported experiencing headaches, irritability, and a lack of energy following his purchase of a propane heater in October 1997. Moreover, the appellant reported that, following his offenses and while residing in the Bedford County Jail, he experienced difficulty studying calculus, remembering what he had eaten for breakfast, and remembering to telephone his father. The appellant had no difficulty remembering the murder of his children, albeit he declined to describe the details of the murders to Dr. Kirshner.

Dr. Kirshner's neurological examination comprised four components: an examination of the appellant's mental status, an examination of his cranial nerves, a "motor examination," and a "sensory examination." The results of the testing were largely "normal" with the sole exception of "an abnormally slow rate of movement on some fine coordination tests. Rapid alternating movements and fine finger movements." Moreover, an M.R.I. test of the appellant's brain produced normal results with the exception of an "inflamed sinus." Nevertheless, Dr. Kirshner opined that the results of his testing did not preclude carbon monoxide poisoning and accompanying impact upon the appellant's brain and, therefore, behavior. The doctor clarified that "carbon monoxide poisoning can produce changes that are microscopic and that wouldn't necessarily be seen on an M.R.I. scan," and the "minor problem with coordination and fine finger movements would be consistent with carbon monoxide poisoning." He also acknowledged that Dr. Auble "found a higher level of cognitive dysfunction as well as mild motor slowing bilaterally" and that his testing was less sensitive than testing performed by Dr. Auble. That having been said, Dr. Kirshner declined to diagnose the appellant with carbon monoxide poisoning.

Dr. Pamela Auble, a clinical neuropsychologist, testified that she interviewed the appellant and administered various standardized tests to the appellant in June 1998, approximately six months following the appellant's offenses. She also reviewed various records pertaining to the appellant, including the appellant's military records, Dr. Sissom's report, the report of a psychiatric evaluation performed by Dr. William D. Kenner, and the report of a neuropsychological examination performed by Dr. Daniel Martell.

Dr. Auble related to the jury that her testing of the appellant's "thinking and memory and attention" revealed that the appellant has a superior intelligence quotient (IQ) of 120 and was proficient in basic language skills, in learning verbal information, and in transitioning between different ideas. However, he was experiencing deficits in the processing of information, in learning visual information, and in motor speed and manual dexterity. Dr. Auble's testing of the appellant's personality further revealed that he experienced difficulty relating to people. However, the neuropsychologist noted that the appellant was not depressed, anxious, or psychotic at the time of the June 1998 interview. Furthermore, in June 1998, the appellant fully comprehended the nature and consequences of his offenses, and he was able to distinguish between right and wrong.

Like Dr. Kirshner, Dr. Auble opined that the results of her testing were consistent with past exposure to carbon monoxide. Also like Dr. Kirshner, however, she declined to definitively conclude that the appellant was, in fact, exposed to carbon monoxide. Rather, Dr. Auble opined that the appellant was suffering from major depression at the time he murdered his children, basing her conclusion primarily upon information obtained from the appellant during the June 1998 interview and other records pertaining to the appellant. She posited that the appellant's depression at the time of the murders stemmed from the termination of his marriage and "his concerns over [the] well-being of his children." Correspondingly, she explained the contrast between the appellant's mental state at the time of her evaluation and his mental state at the time of the murders by observing that, "at the time I saw him as he said it, really he didn't have to worry about his children anymore and how they were being taken care of. In November of '97 that was a very big concern for him."

In short, at the time of Dr. Auble's interview of the appellant in June 1998, he was "glad [his children] were dead."

Dr. William D. Kenner, a psychiatrist, testified on behalf of the appellant. Dr. Kenner related that he interviewed the appellant in June and July 1998. He also interviewed several members of the appellant's family, examined medical records pertaining to the appellant, reviewed reports of evaluations of the appellant performed by Dr. Kirshner and Dr. Auble, reviewed reports issued by Dr. Sissom and Ralph Mosley, and consulted with Dr. Auble and Dr. Seger concerning the appellant's case. Finally, he reviewed literature concerning both "filicide," i.e., the phenomenon of parents killing their children, and carbon monoxide poisoning.

Dr. Kenner noted that filicide is closely associated with the occurrence of major depression, particularly "agitated depression." Dr. Kenner explained that a parent suffering from "agitated depression" will be "kind of bland but they keep moving all of the time and they can't sleep. They can't focus their attention and so forth." Moreover, such depression is frequently accompanied by "psychotic features" or delusional thoughts. In particular, Dr. Kenner noted that a severely depressed parent may believe that his life is worthless and reach the same conclusion about his children's lives. He will therefore murder his children in the belief that he is "sav[ing] them from what . . . is a terrible fate and that is to go on and live." The psychiatrist labeled such murders "altruistic murders" and remarked that "[t]he interesting thing is the more a parent loves his or her children, the greater the risk is that they will kill them if they get severely depressed." He also observed that, in contrast to mothers who commit filicide, fathers who commit filicide

> will more often kill themselves or . . . they will kill their wife; if neighbors' kids happen to be over visiting or anything like that, they can sometimes be included.

> Fathers will also kill the family pets . . . .

Often, the death of the children affords the depressed parent a sense of relief. Dr. Kenner concluded, "This is a severe illness."

Dr. Kenner asserted that the appellant matches the profile of a father who would commit filicide. Dr. Kenner noted the appellant's close relationship with his children. Moreover, the psychiatrist opined that the appellant was suffering from major depression at the time of the murders. In particular, Dr. Kenner observed that the appellant's family history includes several suicides, and the appellant's father was an alcoholic. Moreover, prior to the murders, the appellant had reportedly experienced several episodes of depression. Indeed, Dr. Kenner learned from his interviews with the appellant and the appellant's family members that, during the months preceding the murders, the appellant was

> unable to sleep or take time from work. He would work until 10 p.m. every night. He worked seven days a week except when he went to see his kids.

> He lost interest in all other activities except for work and taking care of his children as much as he could.
>
> He had - - [family members] described difficulty in thinking and concentration. He would speak slowly at times and he would kind of stare off into space. Looked spacey in their words.
>
> In the month before the crime, his father found him lying on the floor without speaking. Just a grown man lying on the floor for no reason.
>
> [Family members] also noticed that he had lost weight. His eyes looked sunken. You could see his ribs. They were showing through his chest wall. He withdrew from people. Withdrew from any kind of human contact.

Additionally, the appellant's father reported to Dr. Kenner that, one month prior to the murders, the appellant expressed a desire to commit suicide.

> Dr. Kenner added that the appellant's depression was exacerbated by carbon monoxide poisoning. However, he emphasized that
>
>> this crime has much more to do with major depression than carbon monoxide. Carbon monoxide is an additive issue here. It is not the sort of underlying issue that had he just had carbon monoxide poisoning that certainly wouldn't have produced a crime like this.
>>
>> . . . .
>>
>> People that have carbon monoxide poisoning don't kill their kids. It is only people who have major depression who do that. Carbon monoxide poisoning is going to make somebody who has a major depression worse; make them more irritable.

Dr. Kenner conceded that a person can suffer from major depression and remain capable of distinguishing right from wrong. More specifically, the psychiatrist concluded that parents who commit filicide "know it's against the law but [typically believe] it's done for almost the right reasons."

In rebuttal, the State presented the testimony of Ralph Mosley, a "certified safety professional" and an expert in the field of industrial safety. Mosley testified that, on September 10, 1998, he visited the scene of the murders. In the rear bay of Holton's garage, Mosley reconstructed the appellant's living quarters and tested the performance of the appellant's propane heater within the enclosed area. Mosely reconstructed the appellant's living quarters based upon descriptions he received from the police as well as the appellant's uncle. When the reconstruction was complete, he turned on the propane heater and allowed the temperature in the living quarters to rise to 76 degrees Fahrenheit. Then, while the heater continued to operate, Mosley collected air samples over

a thirty-six-minute period.  Subsequent testing of the air samples revealed that the heater's emissions were "well within" standards set forth by the state and federal governments.  Indeed, Mosley observed that no contaminants "even came close to a threshold level or permissible level that the government[] allows.  They were all well underneath those levels."  Mosely did not detect any carbon monoxide in the air.  Mosely explained that propane is the cleanest burning fuel available, having less of a propensity to produce carbon monoxide than any of the common petroleum-based fuels. Mosley conceded that he did not compare his reconstruction of the appellant's living quarters with any applicable air ventilation standards.  However, he noted that, in reconstructing the living quarters, he attempted to allow as little ventilation as possible in order to simulate a "worst-case scenario."

The State also presented in rebuttal the testimony of Dr. Daniel Martell, a forensic neuropsychologist.  Dr. Martell interviewed and administered tests to the appellant on March 30, 1999.  Additionally, Dr. Martell reviewed the police reports concerning the appellant's offenses, including the appellant's confessions, and the appellant's medical records and reports issued by other experts testifying in the appellant's case.  Finally, he visited the scene of the murders and spoke briefly with the detectives investigating the appellant's offenses.

Dr. Martell agreed with both Dr. Auble and Dr. Kenner that the appellant was suffering from major depression at the time of the murders.  Indeed, Dr. Martell noted that the appellant was suffering from depression at the time of the March 30, 1999 interview.  Consistent with these observations, the neuropsychologist remarked that records pertaining to the appellant reflected a history of depression.  Also, Dr. Martell added that the appellant was suffering from a personality disorder with two components.  First, the appellant was "passive aggressive," "a particular disorder in which people act out their anger or hostility sometimes in passive ways."  Second, the appellant had a "schizoid personality."  In other words, he was a "loner, a person who isolated himself from others and has poor social skills."  Finally, with respect to the possibility of carbon monoxide poisoning, Dr. Martell concluded:

> I had seen the report of . . . Dr. Sissom as well as the reports of . . . Dr. Kenner and Dr. Auble.  I was quite persuaded, however, by Mr. Mosely's report that there was not carbon monoxide being produced by that heater.  That together with the MRI study that was done at the hospital by Dr. Kirshner, which showed none of the holes in the brain that you would expect to see in someone with carbon monoxide poisoning, and the fact that his neuropsychological test scores could clearly be explained by his depression, leads me to the conclusion that he did not suffer from any form of carbon monoxide poisoning.

In contrast to Dr. Auble and Dr. Kenner, Dr. Martell specifically addressed the appellant's capacity to intend and premeditate his children's deaths.  Dr. Martell asserted that in fact the appellant was capable of forming the requisite mental state.  He noted the appellant's contemplation of murdering his children for several years prior to November 30, 1997, and the appellant's elaborate planning and preparations over several days prior to the murders, including the

-16-

formulation of "a time chart of exactly how this would go off." The neuropsychologist also emphasized the manner in which the appellant murdered his children, targeting their hearts and firing multiple shots to ensure their deaths.

Dr. Martell likewise affirmed the appellant's ability to appreciate the nature or wrongfulness of his actions at the time of these offenses. In this regard, he emphasized the appellant's efforts to conceal both his plans and the accompanying preparations for his offenses from everyone including his wife and children and his use of a "ruse" or "trick" to lure his children into positions conducive to the planned murders. Moreover, Dr. Martell recalled the appellant's account to him that,

> [d]uring the time he is committing these crimes, he has had enough forethought and enough planning to put on the police scanner so that he can be listening to see if anybody hears his gunshots and reports it to the cops and be able to make a hasty retreat from where he is . . . .
>
> He also says that he has parked his car in such a way that it is not faced in but faced out so that he can get away quickly if he should be discovered in what he is doing.
>
> These behaviors are indications to me that he appreciates the nature of what he is doing. He appreciates the fact that it is wrong to kill the children because he is listening for the police in case he might get caught.

Dr. Martell additionally noted the appellant's statements that, following the offenses, he concealed the bodies and the murder weapon from view and washed blood from himself. Indeed, the appellant's ultimate surrender to the police was itself an acknowledgment of wrongdoing.

Dr. Martell concluded that, although depression may affect a person's "judgment and thought processes," "depression is not so severe a disorder, and certainly was not in Mr. Holton's case, that you can't understand the nature and consequences of your behavior," including the wrongfulness of your behavior, or intend to engage in that behavior or premeditate that behavior. Contradicting Dr. Kenner's theory of "altruistic murders," Dr. Martell observed with interest the appellant's inclusion of the daughter of his wife's current boyfriend in his list of planned targets, remarking that the appellant was a very "angry" person at the time of the offenses in addition to suffering from depression, and he "was looking to cause as much pain to his ex-wife and her new boyfriend as he could."

Following the parties' presentation of proof, the jury deliberated for fifty minutes and found the appellant guilty of all four counts of first degree premeditated murder. The court immediately proceeded to the sentencing phase of the appellant's trial.

**Sentencing Phase**

-17-

As noted previously, the State sought to establish at the sentencing phase the following aggravating circumstances: with respect to all four counts of the indictment, the appellant's commission of "'mass murder,' which is defined as the murder of three (3) or more persons whether committed during a single criminal episode or at different times within a forty-eight-month period," Tenn. Code Ann. § 39-13-204(i)(12); and, with respect to the counts pertaining to ten-year-old Brent Holton, six-year-old Eric Holton, and four-year-old Kayla Marie Holton, the murder was committed against a person less than twelve years of age, and the appellant was eighteen years of age or older, id. at (i)(1). In establishing the above aggravating factors, the State essentially relied upon the proof adduced during the guilt/innocence phase of the appellant's trial but also re-submitted for the jury's consideration both the appellant's November 30, 1997 confession containing the appellant's birth date and the custody order issued by the Bedford County Juvenile Court on February 27, 1996, containing the children's birth dates.

The appellant did not dispute the applicability of the above aggravating circumstances but instead asserted that the aggravating circumstances were outweighed by the following mitigating circumstances: (1) the defendant has no significant history of prior criminal activity; (2) the murder was committed while the appellant was under the influence of extreme mental or emotional disturbance; (3) the murder was committed under circumstances that the appellant reasonably believed to provide a moral justification for his conduct; (4) the capacity of the appellant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of a mental disease or defect that was insufficient to establish a defense to the crime but substantially affected his judgment; and (5) any other mitigating circumstance raised by either the prosecution or the defense during both the guilt/innocence phase of the trial and the sentencing phase. See Tenn. Code Ann. § 39-13-204(j).

Like the State, the appellant primarily relied upon the evidence adduced during the guilt/innocence phase. In this regard, the appellant acknowledged on the record that, contrary to the advice of his counsel, he was largely foregoing the presentation of additional mitigating evidence. The appellant did, however, recall to the witness stand Captain Dan Brooks, the administrator of the Bedford County Jail. Brooks testified that the appellant had been incarcerated in the jail since November 30, 1997, and, during his residence in the jail, had obeyed the rules, performed assigned tasks satisfactorily, and interacted well with staff members. Brooks additionally noted that the appellant was isolated from other inmates at his own request but regularly received visits from family members.

After deliberating for two hours and fifteen minutes, the jury returned sentences of death for each count of the indictment. The appellant now appeals both his convictions and sentences. Again, the appellant presents the following issues for our review: (1) whether the evidence adduced at trial is sufficient to support the jury's verdicts; (2) whether the statute setting forth the defense of insanity in Tennessee is violative of the United States Constitution in the context of a prosecution for first degree premeditated murder; (3) whether under the United States Constitution inadequate acoustics in the courtroom during his trial denied the appellant his right to a fair trial; (4) whether under the United States and Tennessee Constitutions the imposition of a

sentence of death violates a criminal defendant's fundamental right to life; (5) whether the evidence adduced during the guilt/innocence and sentencing phases of the appellant's trial supports the jury's imposition of sentences of death; and (6) whether the appellant's sentences of death are comparatively disproportionate.

## II. Analysis
### Sufficiency of the Evidence[3]

In order to successfully challenge the sufficiency of the evidence underlying his convictions, the appellant carries the burden of demonstrating to this court that no "rational trier of fact" could have found the essential elements of first degree premeditated murder beyond a reasonable doubt for each count of the indictment. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). This standard reflects the State's burden at trial of proving every essential element of a charged offense beyond a reasonable doubt, In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970); State v. Hall, 958 S.W.2d 679, 689-690 (1997); State v. Sensing, 843 S.W.2d 412, 417 (Tenn. 1992), while simultaneously allowing that "a guilty verdict 'removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt,'" State v. Ross, 49 S.W.3d 833, 844 (Tenn. 2001). In other words, all factual issues raised by the evidence, including questions concerning the credibility of witnesses and the weight and value to be given the evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). Accordingly, the State is entitled on appeal to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). These principles apply to convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600 (2001).

As relevant to the instant case, the legislature has defined first degree murder as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). "[A] person . . . acts intentionally with respect to . . . a result of [his] conduct when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302(a) (1997); cf. State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000), cert. denied, 531 U.S. 1197, 121 S. Ct. 1202 (2001). Premeditation, in turn,

> is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the

---

[3]Appellant's issue I.

accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

The appellant did not deny at trial that he killed his children, nor does he deny killing his children in this appeal. Rather, the principal issue in the appellant's case has been his mental state at the time of these offenses. We have already noted that, at trial, the appellant presented testimony in support of the affirmative defense of insanity and, alternatively, the proposition that he did not possess the capacity at the time of the murders to form the requisite mental state for first degree premeditated murder. In his brief on appeal, the appellant appears to rely solely upon a claim of diminished capacity.

It is worthy of repetition that the State was required to prove premeditation, and therefore the exercise of reflection and judgment, beyond a reasonable doubt in order to obtain a conviction of first degree premeditated murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Hall, 958 S.W.2d at 689; State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992); State v. Schafer, 973 S.W.2d 269, 274 (Tenn. Crim. App. 1997); see also Tenn. Code Ann. § 39-11-201(a)(2) (1997). In the absence of statutory definitions for the terms "reflection" and "judgment," we are left to interpret their natural and ordinary meanings within the context of the entire statute. State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000). In the context of the entire statute, their natural and ordinary meanings appear consistent with Webster's definitions of "reflection" as "a fixing of the thoughts on something" and "judgment" as "the forming of an opinion, estimate, notion, or conclusion, as from circumstances presented to the mind." Random House Webster's Unabridged Dictionary 1036 & 1620 (2d ed. 1998). Lest the State's burden of proof be removed in contravention of constitutional and statutory law, the rule of "diminished capacity" permitted the appellant to introduce expert testimony concerning the impact of any mental disease or defect upon his capacity to fix his thoughts upon murdering his children and form an opinion or conclusion thereon, i.e., an intent to kill, prior to the murders themselves. Hall, 958 S.W.2d at 688-690; State v. Abrams, 935 S.W.2d 399, 402 (Tenn. 1996); State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). Generally speaking, such testimony may warrant "an acquittal of the indicted offense and a conviction for a lesser included offense." State v. Perry, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999); see also Hall, 958 S.W.2d at 688.

In contesting the jury's finding of premeditation, the appellant emphasizes the experts' unanimous diagnosis that he was suffering major depression at the time of these offenses. The appellant also notes Dr. Kenner's opinion that, due to his depression, he was experiencing the delusion that his children's lives were sufficiently terrible to render death the preferable solution. Finally, he notes Dr. Martell's broad concession that major depression may affect a person's "judgment and thought processes." The difficulty faced by the appellant is the absence of any expert testimony that his depression rendered him incapable of premeditation, and Dr. Martell's testimony

to the contrary. It was the jury's prerogative to accredit the State's expert witness. Perry, 13 S.W.3d at 734.

Moreover, even absent the State's expert witness, we have previously observed that expert testimony that, at the time of an offense, a defendant was suffering from a mental disease or defect affecting his ability to perceive reality "does not necessarily imply that the defendant lacked the capacity to premeditate." State v. Holder, 15 S.W.3d 905, 913 (Tenn. Crim. App. 1999); see also State v. Brian Val Kelley, No. M2001-00461-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 424, at *60 (Nashville, May 7, 2002); State v. William Binkley, No. M2001-00404-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 305, at **16-17 (Nashville, April 5, 2002); State v. Mabel J. Longmire, No. W1999-00216-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 108, at *14 (Jackson, February 15, 2001), perm. to appeal denied, (Tenn. 2001). More specifically, we stated in Holder, 15 S.W.3d at 913, "This Court may not assume that a defendant suffering from paranoid schizophrenia accompanied by delusions is necessarily incapable of premeditated murder." Accordingly, we concluded that a rational trier of fact could have found beyond a reasonable doubt that the defendant was capable of premeditation despite the defendant's paranoid schizophrenia at the time of the offense and his consequent delusion that God had ordered him to kill the victim. Id. Similarly, in the recent case of Kelley, No. M2001-00461-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 424, at *60, we approved a jury's verdict of guilt of first degree premeditated murder despite the unanimous opinion of experts that the defendant was suffering a severe mental disease or defect at the time of the offense and the defendant's consequent delusion that killing his daughter would "pave the way for Christ's second coming." Significantly, in finding evidence of premeditation in Kelley, we noted that the appellant "argued with God when he first received instructions to kill his child." Id. In sum, a criminal defendant may fix his thoughts upon murder and form an opinion or conclusion thereon prior to committing the murder although the facts upon which he bases his intent to kill are the product of delusions stemming from a mental illness or defect.

In any event, Dr. Auble conceded that the appellant expressed satisfaction at the death of his children when he was neither depressed, anxious, nor psychotic. Correspondingly, as noted by Dr. Martell, the appellant himself contradicted Dr. Kenner's theory of "altruistic murders" in his statements to the police, clearly indicating his desire for revenge against his ex-wife for dividing their family. A jury is not required to accept expert testimony to the exclusion of all other evidence. State v. Nesbit, 978 S.W.2d 872, 886 (Tenn. 1998); Holder, 15 S.W.3d at 912. Indeed, we have previously observed that, "'[o]ther than an accused stating what his or her purpose, intent, or thinking was at the relevant times, the trier of fact is left to determine the [requisite] mental state by making inferences from the surrounding circumstances it finds to exist.'" State v. Coulter, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001)(alteration in original). In this case, the appellant obliged the trier of fact by describing to police his intent, his motivation, and his extensive planning "at the relevant times." Of course, the appellant asserts that "[a]n examination of the entire life of Daryl Keith Holton reveals that the killing of his four (4) children by him was only something that would be done by him when he was not in control of . . . his ability to exercise reflection and judgment." We

respectfully disagree. Circumstantial evidence, which includes the history of the appellant's relationship with his ex-wife and is exhaustively set forth above, was entirely consistent with the appellant's premeditation of his children's murders. Cf. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

The appellant seemingly declines in his brief to challenge the jury's rejection of his insanity defense. Nevertheless, in light of defense counsel's oral argument before this court, we will briefly address the sufficiency of the evidence underlying the jury's finding. In doing so, we acknowledge that our supreme court is currently considering "[h]ow . . . the burden of proof on the issue of insanity affect[s] the standard of review [on appeal] of the jury's findings on insanity." State v. Christopher M. Flake, No. W2000-01131-SC-R11-CD, 2001 Tenn. LEXIS 886, at *1 n.1 (Jackson, December 17, 2001).

Tenn. Code Ann. § 39-11-501(a) (1997) provides that "[i]t is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts." The appellant carries the burden of proving insanity by clear and convincing evidence. Id. In determining the issue of insanity, as when determining a defendant's capacity to premeditate, "the trier of fact may consider both lay and expert testimony and may discount expert testimony which it finds to be in conflict with the facts of the case." Holder, 15 S.W.3d at 912.

Again, the experts in this case unanimously testified that, at the time of these offenses, the appellant was suffering from a mental disease or defect, albeit the experts debated the severity of the appellant's depression. Notwithstanding the experts' dispute, the appellant's own expert, Dr. Kenner, acknowledged that parents who suffer from major depression and commit filicide know that they are violating the law. The appellant's experts did not otherwise address the issue of insanity. In contrast, Dr. Martell testified that the appellant understood the nature of his actions, including the wrongfulness thereof, on November 30, 1997. Contrary to the appellant's suggestion in his brief, his belief that his actions were justified according to any subjective moral code, delusionary or otherwise, was not determinative of the issue of insanity. Kelley, No. M2001-00461-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 424, at **62-66; cf., e.g., State v. Corley, 495 P.2d 470, 472-473 (Ariz. 1972); People v. Serravo, 823 P.2d 128, 133-138 (Colo. 1992); State v. Wilson, 700 A.2d 633, 637-643 (Conn. 1997); State v. Worlock, 569 A.2d 1314, 1317-1322 (N.J. 1990). Finally, the appellant's actions or words before, at, and immediately after the commission of the offenses support the jury's verdicts. Holder, 15 S.W.3d at 912. This issue is without merit.

-22-

**Constitutionality of Tenn. Code Ann. § 39-11-501 (1997)[4]**

The appellant next contends that the statute setting forth the defense of insanity in Tennessee violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution in the specific context of a prosecution for first degree premeditated murder. Again, the challenged statute places the burden upon the defendant to prove by clear and convincing evidence that he was unable to appreciate the nature or wrongfulness of his actions at the time of the charged offense. Tenn. Code Ann. § 39-11-501(a) (1997). The appellant argues in essence that, because premeditation entails the exercise of reflection and judgment, it necessarily entails the ability to appreciate the nature or wrongfulness of one's actions, i.e., sanity. He concludes that, if premeditation entails sanity, then requiring a defendant to prove insanity by clear and convincing evidence shifts the burden of proof for an essential element of first degree premeditated murder from the State to the defendant.

Recently, in State v. Perry, 13 S.W.3d 724, 739 (Tenn. Crim. App. 1999), this court rejected a defendant's claim that Tenn. Code Ann. § 39-11-501 "unconstitutionally shifts the burden of proof to the defendant." However, we reached our conclusion in Perry in the context of a defendant's challenge to his conviction of second degree murder. Even so, we relied upon the United States Supreme Court's decision in Leland v. Oregon, 343 U.S. 790, 72 S. Ct. 1002 (1952). In Leland, id. at 791-793, 72 S. Ct. at 1004-1005, an Oregon jury convicted the defendant of first degree murder pursuant to a statute requiring that the killing be done purposely and with deliberate and premeditated malice. The defendant challenged Oregon's statutory defense of insanity, which required that the defendant prove his inability to understand the wrongfulness of his act beyond a reasonable doubt. Id. at 792 & 800, 72 S. Ct. at 1004 & 1008. Specifically, the defendant argued

> that this statute in effect requires a defendant pleading insanity to establish his innocence by disproving beyond a reasonable doubt elements of the crime necessary to a verdict of guilty, and that the statute is therefore violative of that due process of law secured by the Fourteenth Amendment.

Id. at 793, 72 S. Ct. at 1004. The Supreme Court rejected the defendant's argument, id. at 799, 72 S. Ct. at 1007-1008, emphasizing that the trial court's instructions to the jury adequately distinguished the issues of the defendant's commission of the crime charged and the defense of insanity, id. at 795-796 & 800, 72 S. Ct. at 1006 & 1008. Notably, the Court disclaimed the significance of the degree of burden placed upon the defendant to its decision. Id. at 798, 72 S. Ct. at 1007; see also United States v. Amos, 803 F.2d 419, 421 (8th Cir. 1986)("The Supreme Court in Leland . . . held that a criminal defendant may, consistent with due process, be required to prove his [in]sanity beyond a reasonable doubt. It is axiomatic, therefore, that a lesser standard of proof, such as the clear and convincing standard, may be imposed."); cf. Cooper v. Oklahoma, 517 U.S. 348, 367-368, 116 S. Ct. 1373, 1383 (1996).

---

[4]Appellant's issue IV.

Following <u>Leland</u>, the Court has clarified that placing the burden of proving an affirmative defense upon a criminal defendant will only violate due process if proving the affirmative defense necessarily negates any essential element of the offense. <u>See, e.g.</u>, <u>Patterson v. New York</u>, 432 U.S. 197, 206-207, 97 S. Ct. 2319, 2325 (1977); <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 686-687, 95 S. Ct. 1881, 1883-1884 (1975); <u>see also</u> <u>Gall v. Parker</u>, 231 F.3d 265, 286-287 (6th Cir. 2000); <u>Wood v. Marshall</u>, 790 F.2d 548, 550 (6th Cir. 1986). In <u>State v. Holder</u>, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999), in the context of a first degree murder prosecution, we remarked that "sanity is not an element of a crime." Correspondingly, we have already stated in this opinion that a criminal defendant may exercise reflection and judgment prior to committing a murder although the facts upon which he bases his decision to murder are the product of delusions stemming from a mental disease or defect. In this regard, we acknowledge our prior observations that an ability to understand the wrongfulness of one's acts suggests an ability to engage in some form of reflection and judgment. <u>See, e.g.</u>, <u>Holder</u>, 15 S.W.3d at 913; <u>State v. Mabel J. Longmire</u>, No. W1999-00216-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 108, at *14 (Jackson, February 15, 2001). However, we have never indicated that an ability to understand the wrongfulness of one's acts is necessary to the exercise of reflection and judgment. Finally, as in <u>Leland</u>, the trial court's charge to the jury in this case adequately distinguished the issues of the appellant's commission of the charged offenses and the defense of insanity. Accordingly, this issue is without merit.

### Trial Conditions[5]

The appellant also argues that poor acoustics in the courtroom during his trial denied him the fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. In support of his argument, the appellant cites numerous instances in the record wherein the trial participants expressed difficulty hearing the proceedings.

Preliminarily, we note our supreme court's prior observation that the Fifth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant's right to a fair trial whereas the Sixth Amendment largely defines the basic elements of a fair trial. <u>State v. Carruthers</u>, 35 S.W.3d 516, 559 (Tenn. 2000)(citing <u>Strickland v. Washington</u>, 466 U.S. 668, 684-685, 104 S. Ct. 2052, 2063 (1984)), <u>cert. denied</u>, 533 U.S. 953, 121 S. Ct. 2600 (2001). In any event, the appellant correctly observes that a fair trial entails a jury mentally and physically capable of hearing and deliberating upon the evidence adduced at trial, <u>cf.</u> Tenn. Code Ann. § 22-1-102 (1994); <u>State v. Parton</u>, 817 S.W.2d 28, 33 (Tenn. Crim. App. 1991), in addition to a defendant's receipt of the effective assistance of counsel. Moreover, "[o]ne of the most fundamental responsibilities of a trial court in a criminal case is to assure that a fair trial is conducted." <u>State v. Franklin</u>, 714 S.W.2d 252, 258 (Tenn. 1986); <u>see also</u> <u>Parton</u>, 817 S.W.2d at 35 (observing that, regardless of the actions of the litigants or lawyers, the trial judge has the responsibility to make sure that the appellant receives a proper jury trial and the effective assistance of counsel). To this end, the trial court has "broad discretion in controlling the course and conduct of the trial." <u>State v.</u>

---

[5]Appellant's issue III.

Caughron, 855 S.W.2d 526, 541 (Tenn. 1993); see also State v. King, 40 S.W.3d 442, 449 (Tenn. 2001); State v. Evans, 838 S.W.2d 185, 195 (Tenn. 1992).

The record reflects that all the trial participants, including the trial court, acknowledged the poor acoustics in the courtroom in which the appellant was tried. The record also reflects, however, that the trial court provided the following instruction to the jury at the trial's commencement:

> This, as you all know, is an extremely important matter to both the State of Tennessee and the defendant. It is extremely important that you be able to hear all of these proceedings.
>
> Consequently if during the course of the presentation of the evidence or the arguments or statements of counsel you are unable to hear any party, a witness, an attorney, or myself, please let me know. We will have that person adjust their volume or speech pattern in such a manner that you may hear all of the evidence in this case. Do not hesitate to raise your hand at any time you are unable to hear the proceedings. We will make whatever adjustments as are necessary to see that you can hear.

Moreover, the record reflects that, during the course of the appellant's trial, jurors in fact informed the court if they were having any difficulty hearing a witness' testimony, and the trial court admonished the witness accordingly. Also, the court made "technical adjustments" to the courtroom arrangement in order to assist participants in hearing the proceedings, including providing "special hearing devices" to jurors during the replay of audio tape recordings. Indeed, in denying the appellant's motion for new trial, the court reaffirmed that, "shortly after the beginning of the trial . . . I took control of the - - at least the amplification system and replaced the microphones and rearranged the courtroom which I think helped tremendously." Counsel for both the State and the appellant joined in the trial court's efforts to eliminate the impact of poor acoustics by periodically cautioning witnesses to speak loudly and occasionally asking that witnesses repeat testimony.

Absent from the record is any indication by the trial court or counsel that the poor acoustics in the courtroom rendered the performance of their respective duties impracticable. Also absent from the record is any indication that the jury missed any portion of the proceedings due to the poor acoustics. Notably, defense counsel at no time requested a mistrial on the basis of the poor acoustics. "At most, the record supports a conclusion that, at times, it was difficult to hear in the courtroom." People v. Duff, 419 N.W.2d 600, 602 (Mich. Ct. App. 1987). The appellant nevertheless suggests the application of the principle announced by the United States Supreme Court in Estes v. Texas, 381 U.S. 532, 542-543, 85 S. Ct. 1628, 1632-1633 (1965), that, although "in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused[,] . . . at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." Cf. also Holbrook v. Flynn, 475 U.S. 560, 568-572, 106 S. Ct. 1340, 1345-1348 (1986). We simply disagree that the courtroom arrangement in this case presented a case of inherent prejudice, much less actual prejudice. Cf.

-25-

People v. Vaughn, 340 N.W.2d 310, 312 (Mich. Ct. App. 1983)("From the record it appears that the acoustic conditions in the courtroom were so intolerable and so interfered with the orderly conduct of the trial that defendant was denied a fair trial."). In short, the trial court properly exercised its discretion by taking the necessary steps to ensure that all participants could hear the proceedings. Accordingly, this issue is without merit.

## The Constitutionality of the Death Penalty[6]

The appellant additionally asserts that the death penalty is violative of the fundamental right to life guaranteed by the United States and Tennessee Constitutions. Relying essentially upon substantive due process and equal protection principles, the appellant's argument is two-fold: (1) the death penalty never promotes a compelling state interest; and (2) even assuming the contrary, the State's pre-trial offer to the appellant of a sentence of life imprisonment in exchange for a guilty plea conclusively demonstrated the availability in his case of less intrusive means to promote the State's interest. As noted by the State, both this court and our supreme court have previously rejected similar arguments. See State v. Mann, 959 S.W.2d 503, 517 & 536 (Tenn. 1997); State v. Bush, 942 S.W.2d 489, 507 & 523 (Tenn. 1997); Brimmer v. State, 29 S.W.3d 497, 531 (Tenn. Crim. App. 1998); Byron Lewis Black v. State, No. 01C01-9709-CR-00422, 1999 Tenn. Crim. App. LEXIS 324, at **73-74 (Nashville, April 8, 1999). The appellant is not, therefore, entitled to relief.

## Review Mandated by Tenn. Code Ann. § 39-13-206(c) (1997)[7]

Pursuant to Tenn. Code Ann. § 39-13-206(c) (1997), this court must also make the following determinations: (1) whether the jury imposed sentences of death upon the appellant in an arbitrary fashion; (2) whether the evidence supports the jury's findings of statutory aggravating circumstance(s); (3) whether the evidence supports the jury's finding that the aggravating circumstance(s) outweigh(s) any mitigating circumstances; and (4) whether the sentences are excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

### a.      Review of Aggravating Circumstances

As noted earlier, with respect to all four counts of the indictment, the jury found the aggravating circumstance that the defendant committed "'mass murder,' which is defined as the murder of three (3) or more persons . . . committed during a single criminal episode." Tenn. Code Ann. § 39-13-204(i)(12) (1997). Additionally, with respect to Counts Two, Three, and Four, the jury found that the victims were less than twelve years of age and the defendant was eighteen years of age or older. Id. at (i)(1). Having reviewed the evidence supporting the jury's findings in a light

---

[6]Appellant's issue II.

[7]Appellant's issues V and VI.

most favorable to the State, we conclude that "'a rational trier of fact could have found the existence of the aggravating circumstance[s] beyond a reasonable doubt.'" State v. Keen, 31 S.W.3d 196, 205 (Tenn. 2000)(quoting State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000)), cert. denied, 532 U.S. 907, 121 S. Ct. 1233 (2001). Indeed, the appellant has never disputed their applicability.

### b. Review of the Jury's Weighing of Aggravating and Mitigating Circumstances

Our review of mitigating evidence presented on behalf of the appellant during the sentencing phase of his trial and contained in the record of the guilt/innocence phase further convinces us that a rational trier of fact could have imposed sentences of death for all four counts of first degree premeditated murder. Specifically, with respect to Count One of the indictment, a rational trier of fact could have concluded beyond a reasonable doubt that the appellant's commission of mass murder outweighs any mitigating circumstances. It follows that, with respect to the remaining counts, a rational trier of fact could have concluded beyond a reasonable doubt that the appellant's commission of mass murder in addition to the respective ages of the victims and the appellant outweigh any mitigating circumstances.

### i. Mitigating Circumstances Generally

Much of the evidence upon which the appellant relied during the sentencing phase of his trial afforded little mitigation. For example, the appellant's lack of any significant history of prior criminal activity was undercut by his past physical abuse of his ex-wife. As to his ex-wife's neglect of their children, the appellant himself enabled his wife's alcoholism and, despite her neglect, recommended to the Bedford County Juvenile Court in 1996 that she retain custody of the children. The appellant's own relationship with his children prior to the murders merely rendered them vulnerable to his offenses. With respect to his depression, his expressions to police of malice toward his ex-wife constituted more convincing evidence of motive than Dr. Kenner's theory of "altruistic murders." Moreover, the appellant's behavior in jail pending trial and even his military service could hardly be said to outweigh or counterbalance the mass murder of his children, three of whom were less than twelve years of age.

### ii. Residual Doubt

In approving the jury's weighing of aggravating and mitigating circumstances, we note the appellant's assertion that residual doubt warranted a sentence of life imprisonment. "'Residual doubt evidence,' in general, . . . consist[s] of proof admitted during the sentencing phase [of capital proceedings] that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase." State v. Timothy McKinney, __ S.W.3d __, No. W1999-00844-SC-DDT-DD, 2002 Tenn. LEXIS 155, at *30 (Jackson, March 26, 2002); see also Tenn. Code Ann. § 39-13-204(c) (1997). Moreover, in arguing to the jury during the sentencing phase, a defendant may refer to evidence from the guilt/innocence phase creating residual doubt. McKinney, __ S.W.3d __, No. W1999-00844-SC-DDT-DD, 2002 Tenn. LEXIS 155, at *33. The appellant in this case did not present evidence of residual doubt during the sentencing phase; however, in arguing

to the jury, he did emphasize once again evidence relating to his mental state at the time of these offenses. On appeal, he essentially reiterates his challenge to the sufficiency of the evidence underlying the jury's verdicts of guilt and his challenge to the constitutionality of the statute setting forth the defense of insanity. As we have already suggested, the evidence adduced during the guilt/innocence phase of the appellant's trial overwhelmingly supports the jury's verdicts of guilt, and we decline to revisit the constitutionality of Tenn. Code Ann. § 39-11-501 (1997).

### iii.　Zagorski

The appellant further asserts that, in assessing residual doubt and the jury's weighing of aggravating and mitigating circumstances, we must consider the appellant's refusal to follow counsel's advice during the sentencing phase and present mitigating evidence relating to the abandonment of his children by Ms. Holton and the consequent "burden placed upon [him]." Yet, abundant evidence of both Ms. Holton's deficiencies as a mother and the appellant's relationship with his children was presented to the jury during the guilt/innocence phase of the appellant's trial. "[G]iven that this was not a resentencing hearing, the reality is that the sentencing jury had already heard the [proposed] testimony . . . and had reconciled it in favor of the State's theory of guilt and against the defendant's theory of innocence." State v. Timothy McKinney, __ S.W.3d __, No. W1999-00844-SC-DDT-DD, 2002 Tenn. LEXIS 155, at *35 (Jackson, March 26, 2002). Even more importantly, perhaps, it is well-established that a criminal defendant has the exclusive authority to make substantive decisions concerning the presentation of his defense. See Zagorski v. State, 983 S.W.2d 654, 658 (Tenn. 1998); see also Tenn. Sup. Ct. R. 8, EC 7-7, 7-8. This authority encompasses the decision to forego the presentation of mitigating evidence during the sentencing phase of capital proceedings, and a defendant's subsequent expressions of doubt about the wisdom of his decision will not afford him relief. Zagorski, 983 S.W.2d at 658-659; State v. Michael D. Rimmer, No. W1999-00637-CCA-R3-DD, 2001 Tenn. Crim. App. LEXIS 399, at **19-22 (Jackson, May 25, 2001).

We also note that both defense counsel and the trial court followed the procedures set forth by the supreme court in Zagorski for the purpose of "insuring that the accused has intelligently and voluntarily made a decision to forego mitigating evidence." 983 S.W.2d at 660-661. In particular, we note the appellant's confirmation to the trial court that it was his "free and voluntary decision to forego the presentation of . . . additional mitigating evidence." Moreover, defense counsel noted to the trial court that "[t]here is nothing at this time that would indicate to us that Mr. Holton . . . is not able to make his decisions." We reiterate the absence of any evidence in the record of incompetency notwithstanding numerous evaluations of the appellant by mental health professionals. In the context of the appellant's knowing and voluntary decision to forego the presentation of mitigating evidence, we are unable to say that the jury improperly weighed the evidence before it in imposing sentences of death.

### c.　Arbitrariness and Proportionality

Our review of the record also reveals the trial court's and the jury's substantial compliance with Tenn. Code Ann. § 39-13-204 (1997) and a consequent lack of arbitrariness in the jury's imposition of sentences of death. Moreover, our comparative proportionality review, yet another "'check against the random or arbitrary imposition of the death penalty,'" leaves the jury's sentencing determinations undisturbed. State v. Godsey, 60 S.W.3d 759, 781 (Tenn. 2001). The latter conclusion, however, requires a somewhat more detailed discussion.

We begin our comparative proportionality review with the presumption that the death penalty is proportionate to the crime of first degree murder. Godsey, 60 S.W.3d at 781; State v. Henderson, 24 S.W.3d 307, 315 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997). However, "[i]f the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death in the case being reviewed is disproportionate." Bland, 958 S.W.2d at 665 & 668; see also Godsey, 60 S.W.3d at 782; State v. Keen, 31 S.W.3d 196, 220 (Tenn. 2000), cert. denied, 532 U.S. 907, 121 S. Ct. 1233 (2001). Conversely, we are not required to find that a jury has never imposed a sentence less than death in a case involving a similar murder or even a more atrocious murder. Godsey, 60 S.W.3d at 784; Henderson, 24 S.W.3d at 315; State v. Smith, 993 S.W.2d 6, 21 (Tenn. 1999). In other words, "the isolated decision of a jury to afford mercy does not render a death sentence disproportionate." Smith, 993 S.W.2d at 21; see also Godsey, 60 S.W.3d at 784-785; Keen, 31 S.W.3d at 222.[8] "[O]ur [exclusive] duty 'is to assure that no aberrant death sentence is affirmed.'" Henderson, 24 S.W.3d at 315. In performing our duty, we look at a pool of cases in Tennessee including all "those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death . . . , regardless of the sentence actually imposed." Bland, 958 S.W.2d at 666; see also Godsey, 60 S.W.3d at 783-786. In selecting similar cases, we examine the application of aggravating and mitigating circumstances and otherwise compare the characteristics of both offenses and defendants. Bland, 958 S.W.2d at 667; Tenn. Code Ann. § 39-13-206(c)(1)(D) (1997).

Characteristics relevant to the identification and comparison of similar offenses include the following: (1) the means of death; (2) the manner of death (i.e., whether the death was violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances, including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects of the murder on nondecedent victims. Bland, 958 S.W.2d at 667. Characteristics relevant to the identification and comparison of similar defendants include the following: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the

---

[8]Thus, even assuming the cases are comparable, we reject any implication in the appellant's brief that the jury's imposition of life sentences in State v. James Christopher Tatrow, No. 03C01-9707-CR-00299, 1998 Tenn. Crim. App. LEXIS 1169 (Knoxville, November 2, 1998), requires a finding of disproportionality in this case.

defendant's mental, emotional, or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim(s); and (8) the defendant's capacity for rehabilitation. Id. These factors are not exhaustive, and the reviewing court may consider other characteristics or factors in comparing the characteristics of the offense and the appellant in this case with offenses and defendants in the pool of cases. Keen, 31 S.W.3d at 220.

Briefly summarizing, the appellant was a thirty-six-year-old, highly intelligent white male who killed his four children. The children ranged in age from four years old to twelve years old. The appellant apparently had a close relationship with his children but had also previously contemplated murdering them and thoroughly premeditated the instant offenses. He played upon his children's trust in him to commit the offenses, killing his children by shooting them repeatedly with an SKS semi-automatic rifle at the automobile repair garage where he lived and worked. The appellant also contemplated murdering the daughter of his ex-wife's boyfriend and firebombing his ex-wife's home but lacked sufficient time. The appellant ultimately surrendered to police and confessed to his crimes. Notwithstanding the appellant's history of depression and his depression at the time of these offenses, he admitted to murdering his children in order to "shock" his ex-wife. The appellant also admitted that he entertained no regret or remorse for his actions. Finally, the appellant had previously served in the military, and his history of prior criminal activity consisted primarily of physically abusing his ex-wife.

Several first degree murders in Tennessee involving multiple victims including children have resulted in sentences of death. For example, in State v. Black, 815 S.W.2d 166 (Tenn. 1991), the defendant shot and killed his girlfriend and her six- and nine-year-old daughters in their home. The evidence adduced at trial indicated that the defendant was motivated by his anger at his girlfriend's attempts to reconcile with her ex-husband, who was also the father of her daughters. At the time of the murders, the defendant was on a weekend furlough from the Metropolitan Workhouse in Davidson County pursuant to his conviction for a prior shooting. He denied any involvement in the murders. Nevertheless, a jury found him guilty of the first degree premeditated murder of each victim, imposing a sentence of death for the murder of the six-year-old child and sentences of life imprisonment for the two remaining murders. In addition to the defendant's commission of mass murder and the respective ages of the victim and the defendant, the jury considered the following aggravating factors: the appellant's prior conviction of one or more violent felonies; the heinous, atrocious, or cruel nature of the murder; the commission of the murder to avoid arrest or prosecution; and the commission of the murder during the perpetration of another, statutorily designated felony. In mitigation, the defendant presented the testimonies of a former teacher, friends, and family members that the defendant had been "a good student, a good father, a good provider, a responsible, polite, friendly, helpful, and nonviolent person." He also proffered testimony concerning his religious conversion since the offenses and his good behavior in jail pending trial.

In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the defendant was a thirty-nine-year-old white male of "medium" intelligence who killed his estranged wife and her thirteen- and sixteen-year-old sons from a previous marriage. The evidence adduced at trial indicated that the defendant was angered by his separation from his wife. He had previously assaulted the victims and, in fact, was facing charges for aggravated assault at the time of the murders. In committing the murders, he both shot and stabbed the victims. The defendant's own children by his estranged wife were unharmed. The defendant denied committing the murders. Nevertheless, a jury found him guilty of the first degree premeditated murder of each victim and imposed a sentence of death for each murder. Specifically, the jury found that the defendant's murders of his wife and step-sons were aggravated by the heinous, atrocious, or cruel nature of the murders and the defendant's commission of mass murder. Moreover, the jury found that the defendant's murders of his step-sons were committed for the purpose of avoiding arrest or prosecution and were committed during the perpetration of another, statutorily designated felony. In mitigation, the defendant presented the testimony of co-workers that he was a good employee, and personnel and an inmate from the Davidson County Jail testified that he was a good prisoner. His family also related that the defendant had a mentally retarded son who depended emotionally upon his father. Finally, the defendant proffered proof of a history of mental health problems, and a psychologist testified that the defendant suffered from paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder.

In State v. Payne, 791 S.W.2d 10 (1990), the defendant was a twenty-year-old black male of "medium" intelligence who stabbed to death his girlfriend's twenty-eight-year-old neighbor and the neighbor's two-and-one-half-year-old daughter. The defendant also assaulted the neighbor's three-and-one-half-year-old son, but the child survived. The defendant's motive was unclear, but evidence adduced at trial suggested that he made sexual advances toward his girlfriend's neighbor and, upon encountering resistance, assaulted her with a butcher knife. The evidence adduced at trial also suggested that, at the time of the offenses, the defendant was under the influence of cocaine or intoxicated from drinking beer or Geritol. The defendant denied guilt. Nevertheless, a jury convicted him of two counts of first degree premeditated murder and one count of assault with intent to commit first degree murder. The jury imposed a death sentence for each murder conviction, finding that the defendant knowingly created a great risk of death to two or more persons other than the victim and that the murders were heinous, atrocious, or cruel. Also, in sentencing the defendant for the murder of the two-and-one-half-year-old child, the jury considered the age of the victim and the age of the defendant. The defendant had no significant history of prior criminal activity.

Other cases in Tennessee involving the murder of a child, but not mass murder, and resulting in the imposition of a death sentence have included evidence of child abuse or rape. See, e.g., Keen, 31 S.W.3d at 196; State v. Vann, 976 S.W.2d 93 (Tenn. 1998); State v. Irick, 762 S.W.2d 121 (Tenn. 1988); State v. Coe, 655 S.W.2d 903 (Tenn. 1983). Perhaps a more comparable case is State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), a case involving the mass murder of adults. The

defendant was a twenty-one-year-old Asian male of "medium" or below average intelligence[9] who participated in the armed robbery of a Chinese restaurant, during which robbery three people were killed. Two of the victims were shot in the back of the head in "execution style" murders. The third victim was shot eight times after struggling with his assailants. The defendant cooperated with law enforcement authorities, confessing to police his participation in the robbery and further confessing to shooting at least two of the victims. Evidence adduced at trial suggested that he may have been under the influence of drugs or alcohol at the time of the offenses. A jury convicted the defendant of three counts of first degree felony murder and imposed sentences of death for each murder. In imposing sentences of death, the jury relied upon both the heinous atrocious and cruel nature of the murders and the defendant's commission of mass murder.[10] In mitigation, the defendant adduced evidence of his childhood in Viet Nam, his lack of education, his susceptibility to peer pressure, and his remorse for his offenses. The defendant had no significant prior history of criminal activity.

No two cases are identical with respect to either circumstances or defendants. Henderson, 24 S.W.3d at 315. With that in mind and after reviewing the cases discussed above and many other cases not herein detailed, we are of the opinion that the sentences imposed by the jury in this case are not disproportionate to the penalties imposed in similar cases.

### III. Conclusion

In summary, following a careful and extensive review of the record and the parties' briefs and upon making the determinations required by Tenn. Code Ann. § 39-13-206(c)(1) (1997), we affirm both the appellant's convictions of first degree premeditated murder and his sentences of death.

_____

NORMA McGEE OGLE, JUDGE

---

[9] In Van Tran v. State, 66 S.W.3d 790, 793 n.3 (Tenn. 2001), our supreme court noted that, at the defendant's original 1989 trial, "evidence was introduced to show that the petitioner had below average intellectual functioning, but no standardized test was administered, and there was no evidence introduced as to his intelligence quotient." However, the Rule 12 report from the defendant's original trial reflects a "medium" intelligence level. In any event, the supreme court in Van Tran, 66 S.W.3d at 812, concluded that the execution of the mentally retarded violates the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution, in part because the execution of the mentally retarded constitutes grossly disproportionate punishment, and remanded the defendant's case to the trial court for a determination of whether he is in fact mentally retarded.

[10] In Van Tran, 864 S.W.2d at 480, the supreme court reversed two of the defendant's death sentences and remanded his case for re-sentencing on the basis of the State's failure to establish the heinous, atrocious, or cruel nature of the murders.